**OCEAN SCIENCE AND ENGINEERING INC., Plaintiff,**

v.

**INTERNATIONAL GEOMARINE COR-PORATION, and International Geomarine Corporation (Sudan) Limited, Defendants.**

**Civ. A. No. 3807.**

United States District Court,
D. Delaware.

May 12, 1970.

James M. Tunnell, Jr., and Richard L. Sutton, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Philip A. Ryan and Eugene A. Theroux, of Baker & McKenzie, Washington, D. C., of counsel, for plaintiff.

Michael N. Castle, of Connolly, Bove & Lodge, Wilmington, Del., and Alvin S. Kaufer, of Nossaman, Waters, Scott, Krueger & Riordan, Los Angeles, Cal., of counsel, for defendants.

### OPINION

LATCHUM, District Judge.

This action for breach of contract seeks to recover money allegedly due and owing to the plaintiff from defendants for oceanographic survey work performed in the Red Sea by the plaintiff between February and May 1969.

Jurisdiction is alleged to exist under this Court's admiralty and maritime jurisdiction as provided in 28 U.S.C. § 1333(1) because the contract in question is maritime in nature. The defendants have moved (1) to dismiss the action for lack of admiralty jurisdiction and (2) alternatively, if admiralty jurisdiction is found to exist, to transfer the action pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Central District of California.

### I MOTION TO DISMISS

■ The first question for determination is whether the agreement sued upon here is a maritime contract. If it is, concededly, this Court has admiralty jurisdiction which "extends to all contracts, claims and services essentially maritime." Ex parte Easton, 95 U.S. 68, 72, 24 L.Ed. 373 (1877). In determining whether a particular contract is maritime "the true test is the subject-matter of the contract—the nature and character of the work to be done." State Industrial Commission of New York v. Nordenholt Corp., 259 U.S. 263, 271, 42 S.Ct. 473, 66 L.Ed. 933 (1922); Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

■ Turning to the present contract, a pragmatic consideration of what was to be performed, where it was to be performed and how it was to be performed compels the conclusion that the "transaction relates to ships and vessels, masters and mariners, as the agent of commerce on navigable waters," 1 Benedict on Admiralty, 6th Ed. § 64, and is so essentially maritime in character that it is within the admiralty jurisdiction of this Court.

The pervasive maritime quality of the contract is indicated by a review of its salient features. The contract dated November 25, 1968 entered into between the plaintiff and International Geomarine Corporation (Sudan) Limited, ("IGC Sudan"), a Delaware corporation and wholly owned subsidiary of International Geomarine Corporation ("IGC"), also a Delaware corporation, first recited that IGC Sudan held licenses and had the right to prospect for mineral deposits in underwater areas of the Red Sea and desired the plaintiff to assist it in determining the extent and value of such

mineral deposits. Then followed the operating provisions of the contract,[1] the relevant portions of which may be summarized as follows:

1. Plaintiff agreed to conduct geophysical surveys, make geological observations and measurements and collect geological samples for the purpose of mapping in detail and determining the geological make-up and mineral composition of the sea bottom sediments and interstitial brines of the designated area in the Red Sea.

2. Acoustic surveys would be conducted with specified makes of acoustical equipment and recorders and "coring" and "temperature telemetering" would be done in a particularly described manner.

3. To accomplish the foregoing, the parties agreed to use a certain vessel, the M/V WANDO RIVER[2] with a full complement of six crew members and furnished with all equipment and supplies necessary to perform the mission safely, efficiently and effectively.

4. One Donald Matthews would be master of the M/V WANDO RIVER.

5. Navigation was to be accomplished by specific SHORAN equipment, a named "party chief" was designated to head a party of four men to carry out the prescribed work and IGC Sudan was entitled to designate a field representative, with the right to be aboard the vessel, who was authorized to designate the locality, duration and extent of operations.

6. Plaintiff agreed to deliver all maps, charts, reports, data, information, all work products and other materials resulting from the operation to IGC Sudan at end of the mission or sooner if requested by the field representative.

7. Core samples taken were to be returned to the United States aboard the M/V WANDO RIVER.

8. Elaborate provisions were made relating to defendants' payments under the contract. Defendants were to pay a mobilization charge of $150,743 to mobilize the vessel, and all personnel and equipment to Port Sudan, a monthly operating charge during operations and a demobilization charge of $89,101 to return the vessel, personnel and equipment to the United States.

9. Plaintiff was to be in sole charge of the operation and was designated an independent contractor as IGC Sudan was "interested only in the results of the Operation herein contracted for."

10. IGC Sudan had the right to suspend operation or to terminate the period of operation under the contract by giving written notice. The contract was also to "terminate at the time of the destruction of the vessel."

11. The agreement also provided the interpretation and application of its terms would be governed exclusively by the laws of the State of California.

A mere recital of the above provisions clearly indicates that the performance of the contract contemplated a ship voyage from the United States to the Red Sea where geological surveys would be conducted underwater using a particular oceangoing, properly manned, and equipped vessel. The agreement, so closely related to undersea work to be performed from a vessel, is essentially maritime in character and cannot be classified as a land contract by fine spun distinctions.

While conceding that the contract has maritime features, the defendants argue that they are incidental to the dominant purpose of the agreement, viz. to obtain scientific data and detailed geological maps from plaintiff as an independent contractor. Thus, they emphasize the language of the contract, providing that defendants were "interested only in the results of the Operation * * * con-

---

1. The November 25, 1968 contract incorporated the provisions of plaintiff's letter, dated November 5, 1968, addressed to IGC, the parent of IGC Sudan.

2. The contract further provided that a vessel could be substituted for the M/V Wando River with approval of IGC Sudan.

tracted for", as determinative of its non-maritime nature. The Court is unable to agree with this contention. A realistic examination of the contract in question plainly reveals that its ultimate object is so inseparably related to the manner and place of performance by an ocean-going vessel and crew operating at sea in making an underwater survey that it cannot be deemed to be a land contract outside the maritime and admiralty jurisdiction of this Court. It is essentially one of those contracts with a "genuinely salty flavor" of maritime law of which Mr. Justice Harlan spoke in *Kossick,* supra at 742, 81 S.Ct. 886.

An agreement to perform work similar to that required by the present agreement has been viewed as a maritime contract. In Pure Oil Company v. Geotechnical Corporation of Delaware, 129 F.Supp. 194, 196 (E.D.La.1955), a contract to perform geophysical work from a vessel in the Gulf of Mexico was considered a maritime contract requiring the application of maritime law. The contract in that case had been described in an earlier appeal, Geotechnical Corporation of Delaware v. Pure Oil Company, 196 F.2d 199, 200, 201 (5th Cir. 1952) as one calling for "seismographic work over water" by a vessel operated by an independent contractor and engaged in "seismographic blasting operations in search of oil deposits off the coast of Louisiana in the Gulf of Mexico." In that case, like this one, the operations were being conducted by an independent contractor through its own employees in order to secure the desired result.

■■ Further, defendants' argument proves too much. If the ultimate object of an agreement were the sole factor determining whether a contract was maritime, then a contract of affreightment to deliver goods by ship to a dry land destination would be a non-maritime contract. But such contracts have long been considered within admiralty jurisdiction since they are contracts for maritime services to be performed upon the sea. New Jersey Steam Navigation Company v. Merchants' Bank, 47 U.S. 344, 391, 6 Haw. 344, 12 L.Ed. 465 (1848). The contract in question is not much different, in this sense, from a contract of affreightment; it calls for a maritime service to be performed by a vessel making an oceanographic survey of the bottom of the Red Sea. That the maritime service rendered under the present contract may be a new development, unknown in the past, is no reason to hold that it is outside of this Court's maritime jurisdiction. Romero v. International Terminal Operating Co., 358 U. S. 354, 360, 79 S.Ct. 468, 474, 3 L.Ed.2d 368 (1958) recognized the organic growth and evolving nature of maritime law and jurisdiction by pointing out that Article III, § 2, Cl. 1 (3d provision) of the United States Constitution "empowered the federal courts in their exercise of the admiralty and maritime jurisdiction * ´ * * to continue the development of this law within constitutional limits." Whether a contract is maritime is not a static concept; it depends, as always, upon the nature of the contract and the service to be rendered and performed and its manner of performance.

■ Finally, in attempting to establish the non-maritime nature of the contract, defendants stressed that the agreement was to be governed "exclusively by its terms and by the laws of California." Thus, defendants contend that this provision indicated the parties' intention to regard the contract as non-maritime in nature. This contention must fail for several reasons-: (1) that the parties may have considered the contract non-maritime is not controlling as to its nature, Johnson v. G. T. Elliott, Inc., 152 Va. 121, 146 S.E. 298 (1929); and (2) a court may not be ousted of jurisdiction by agreement, American Sugar Refining Co. v. The Anaconda, 138 F.2d 765 (5th Cir. 1943), aff'd 322 U.S. 42, 64 S.Ct. 863, 88 L.Ed. 1117 (1944). Once the contract is found to be maritime and within admiralty jurisdiction, an agreement amounting to a private

repeal of 28 U.S.C. § 1333 would be a nullity.

## II MOTION TO TRANSFER

Because the agreement in suit has been found to be a maritime contract within this Court's admiralty jurisdiction, the defendants' second motion to transfer the action pursuant to 28 U.S. C. § 1404(a) to the United States District Court for the Central District of California must now be considered.

Any civil action, including an admiralty case, may be transferred under § 1404(a) to another district "where it might have been brought" if the Court in its discretion finds the transfer to be "for the convenience of parties and witnesses, in the interest of justice." Arrowhead Co. v. The Aimee Lykes, 193 F.2d 83, 85 (2d Cir. 1951); Petition of Backman, 122 F.Supp. 896, 899 (D.Del. 1954). An admiralty action may be brought against a corporation in any United States District Court which can obtain personal jurisdiction over that corporation. In re Louisville Underwriters, 134 U.S. 488, 10 S.Ct. 587, 33 L.Ed. 991 (1890); Bartlett-Collins Co. v. Surinam Navigation Co., 381 F.2d 546, 548 (10th Cir. 1967). In this case the defendants could have been served personally in Los Angeles, California where they are doing business and where their principal office is located.

Since the Court has *power* to transfer, the question becomes whether there has been a sufficient showing, in light of the statutory criteria, to cause this Court to move the litigation to Los Angeles.

*Convenience of Parties.* Plaintiff, a Delaware corporation, maintains its principal office at Bethesda, Maryland; it also has a branch office in Long Beach, California. Defendants, likewise Delaware corporations, maintain their only place of business at Los Angeles, California. None of the parties has a place of business in Delaware other than the required statutory office. As between the corporate parties, it would be more convenient to plaintiff for the case to remain here. Bethesda, plaintiff's main base of operations,[3] is approximately 122 miles from the courthouse—a quick, easy and inexpensive distance from Wilmington when compared with Los Angeles. On the other hand, moving the case to California would undoubtedly be more convenient for like reasons to the defendants. But where the transfer would merely shift the inconvenience from one party to the other, the plaintiff's choice of the forum should not be disturbed, Miracle Stretch Underwear Corp. v. Alba Hosiery Mills, Inc., 136 F.Supp. 508 (D.Del.1955).

*Convenience of Witnesses.* At this stage the record is very imprecise as to the number and identity of witnesses that will be needed to try this litigation. This is not unexpected because the disputed issues have not yet been delineated. No answers have been filed and no discovery undertaken. Based on the broad allegations of a complaint filed by the defendant IGC Sudan against plaintiff in a California State Court in February of this year, plaintiff assumes that everything done with respect to the negotiation, execution, and operations under the contract are open to attack and will be raised as defenses in the present suit. On this assumption, plaintiff avers that seventeen of plaintiff's present officers and employees may be necessary as witnesses at trial, only one of whom resides in Los Angeles County. Of the sixteen remaining, twelve are employed at plaintiff's principal office at Bethesda, Maryland and reside in proximity thereto and the balance are located in the State of Florida as crew to the M/V WANDO RIVER, the vessel used in the survey. All parties agree that George Erlanger, a former employee of plaintiff who served as chief of party for most of the survey, and Harvey Lorber, defendants' designated field repre-

3. All of plaintiff's records relating to this contract are kept at its Bethesda office.

sentative on the survey, will be needed as witnesses. Mr. Erlanger is a Connecticut resident and Mr. Lorber resides in Maine. Plaintiff also claims that two witnesses who reside in Khartoum, Sudan, two in Geneva, Switzerland, three in Hanover, Germany, two employees of Edo Western Corporation at College Point, Long Island, New York, five witnesses in Washington, D. C. and possibly some experts from Woods Hole, Massachusetts may also be used as witnesses. Defendants sharply deny that all these persons will be necessary and claim that the essential witnesses will be five persons from California, two from Maryland, one from Maine, one from Massachusetts, one unnamed witness from Edo Western Corporation, whose home office is in Utah, and another unnamed witness from Switzerland.

A mere recital of the number of possible witnesses at this stage indicates that most will come from areas much closer in distance to this Court than to Los Angeles. Possible foreign witnesses will be required to travel a long distance wherever the case is tried. On balance, it appears to this Court, considering the distance, time and expense of travel for witnesses, that trial in this district will be more convenient to the witnesses than it would be if the case were transferred to California. The defendants have not carried the burden of showing that California is a more convenient forum for witnesses than Delaware.

During the course of the oral argument, defendants filed a written offer to pay the plaintiff's expenses in transporting witnesses to California for trial not in excess of $2500 on condition (a) that defendants' motion to transfer is granted and (b) that the Court determine the witness' testimony was reasonably necessary. The Court, while noting this limited offer, does not consider it of much significance in applying the standards of § 1404(a).

■ *Interest of Justice.* Defendants also contend that because the "choice of law" provision of the contract refers to California, the case should be transferred. But because this case is in admiralty, general maritime law principles will apply. Assuming, however, that reference to California law may be necessary, this Court expects no difficulty in applying that law. For this Court to apply foreign law is not such an unusual circumstance as to require transfer. United Airlines, Inc. v. United States, 192 F.Supp. 796 (D.Del.1961); Sund v. American Can Co., 272 F.Supp. 969 (E.D.Wis.1967).

Defendants further contend that one of the issues in this case is the performance of equipment supplied by Edo Western Corporation. They argue that Edo, a Utah corporation with a place of business in Los Angeles, will be amenable to process of the California court but not be amenable to process of this Court. It is also argued that it would be more convenient to defendants to have the district court in California supervise any deposition taken in California. While these points have a bearing on the question of transfer, they appear too insignificant to overcome the balance of convenience already discussed with respect to the parties and witnesses.

■ Having weighed the relevant factors under § 1404(a), it is concluded that defendants have not demonstrated that the balance of convenience or the interest of justice clearly favors trial in California. The motion to transfer will be denied.

An order will be entered denying defendants' motion to dismiss and to transfer.